UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CIVIL ACTION NO. 1:18cv24137

| | | |
|---|---|---|
| PAUL CAMHI, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| OPKO HEALTH, INC. and PHILLIP FROST, | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | <u>DEMAND FOR JURY TRIAL</u> |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Paul Camhi ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by OPKO Health, Inc. ("Opko" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and the complaint in the enforcement action filed by the SEC, *SEC vs. Honig,* No. 18-cv-08175 (S.D.N.Y. Sept. 7, 2018) (the "SEC Complaint") as detailed herein.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Opko common stock between October 8, 2013 and September 7, 2018, inclusive (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

3.      Venue is proper in this District pursuant to §27 of the 1934 Act because certain of the acts and practices complained of herein occurred in this District and Opko is headquartered in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

5.      Plaintiff Paul Camhi purchased Opko common stock as set forth in the accompanying certification incorporated herein by reference, and has been damaged thereby.

6.      Defendant Opko is a healthcare company engaged in the diagnostics and pharmaceuticals businesses in the United States and internationally.  The Company is incorporated in Delaware with its headquarters in Miami, Florida.  Opko common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the symbol "OPK."

7.      Defendant Phillip Frost ("Frost") has been the Company's Chief Executive Officer ("CEO") and Chairman since March 2007.  Defendant Frost made, or caused to be made, false and misleading statements that artificially inflated the price of Opko common stock.  Defendant Frost, because of his positions with the Company, possessed the power and authority to control the contents of Opko's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  He was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions with the Company, his personal participation in the fraud as detailed herein, and his access to material non-public information available to him but not to the public, defendant Frost knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  Defendant Frost is liable for the false and misleading statements pleaded herein.

**BACKGROUND**

8.      Defendant Opko is a medical company focused on diagnostics and pharmaceuticals. For years, Opko has been closely associated with defendant Frost, a prominent healthcare investor and entrepreneur, who has served as the Company's Chairman and CEO since March 2007.

9.      Prior to joining Opko, defendant Frost founded, managed and invested in several successful healthcare ventures over several decades.  For example, defendant Frost founded and served as Chairman of the Board of Key Pharmaceuticals, Inc. ("Key Pharma") from 1972 until the acquisition of Key Pharma by Schering Plough Corporation in 1986 for $835 million.  Defendant Frost also founded and served as Chairman and CEO of IVAX Corporation ("IVAX"), a multi-national pharmaceutical company, from 1987 until the acquisition of IVAX by Teva Pharmaceutical Industries, Limited ("Teva") in January 2006 for $7.4 billion.

10.      These and other ventures have made defendant Frost extremely wealthy, with a net worth of $2.6 billion as of September 2018, according to *Forbes* magazine.  Defendant Frost has used his wealth to engage in a variety of philanthropic endeavors and to build up his reputation as a successful and prominent healthcare investor.  Several buildings bear his name, including the Phillip and Patricia Frost School of Music at the University of Miami, The Patricia & Phillip Frost Art Museum at Florida International University, and the Phillip and Patricia Frost Museum of Science in Miami.  *The South Florida Business Journal* calls defendant Frost perhaps "the most influential investor" in South Florida.

11.      The reputation of defendant Frost as a successful healthcare entrepreneur was extremely valuable to Opko and of material importance to the Company's investors.  As the Company's Chairman and CEO, defendant Frost oversaw and had ultimate responsibility for all aspects of the Company's business and operations. Before and throughout the Class Period, Opko

- 3 -

highlighted its close association with and management by defendant Frost as central to its business strategy.  In addition, Opko portrayed the need to maintain the Company's reputational assets, which included most notably its association with defendant Frost, as vital to the Company's continued financial success.

12.     Unbeknownst to investors, throughout the Class Period, at the same time that defendant Frost's reputation and management were being highlighted by defendants as key Company assets and competitive advantages, defendant Frost was engaged in an illegal pump-and-dump stock fraud scheme with a cabal of Florida-based penny stock investors that put not only his personal reputation at risk, but also exposed the Company to great and undisclosed legal, regulatory and reputational harm (the "Pump and Dump Scheme").

13.     The Pump and Dump Scheme worked as follows.  Defendant Frost and a group of other Florida-based investors led by Barry Honig ("Honig") would invest in small or microcap companies through entities that they owned and/or controlled.  Through these investments, defendant Frost and his co-conspirators would secretly take control over the target company, replacing or otherwise asserting influence and control over the company's management.  With this control, defendant Frost and his co-conspirators would then strip the target company of valuable assets through fraud, subterfuge, undisclosed related-party transactions or other activities.  At times, defendant Frost and his co-conspirators would fail to honor promises made to the target company in order ensure that they received the company's assets on preferential and unfair terms.

14.     Then, with much of the value of the target company destroyed, defendant Frost and his co-conspirators would employ third-party promotional authors to write favorable reviews of the target company, often highlighting the investment of defendant Frost and Opko as evidence that investors should likewise invest in the target company's stock.  In the promotional materials, these

- 4 -

authors falsely denied being compensated by interested parties.  These promotional activities would often (as intended) cause a temporary increase in the price of the target company's stock (the "pump"), allowing defendant Frost and his co-conspirators to sell off some of their position at artificially inflated prices (the "dump").  While defendant Frost and his co-conspirators reaped millions of dollars in profit, outside investors suffered millions of dollars in losses as the target company's share price would inevitably fall.

15.     Beyond the shocking fact that defendant Frost was secretly padding his billions by destroying small businesses and ripping off retail investors during the Class Period, defendant Frost directly involved Opko in the illegal Pump and Dump Scheme.  For example, in February 2012, Opko announced that it had invested in biotech startup BioZone Pharmaceuticals, Inc. ("BioZone"). Opko stated that BioZone's proprietary drug delivery platforms "provide[d] superior final dosage forms" that resulted "in less costly drug manufacturing than other systems."  Opko similarly stated that it had "acquired exclusive world-wide distribution rights to BioZone's enhanced formulation of propofol," used in general anesthesia, "which may address many of the drawbacks with current emulsion formulations of propofol."  BioZone later merged with Cocrystal Discovery, Inc., renamed Cocrystal Pharma Inc. ("Cocrystal"), which had similarly received investments from defendants Frost and Opko.

16.     Similarly, in April 2015, clinical-stage cancer immunotherapy company MabVax Therapeutics Holdings, Inc. ("MabVax") announced that it had received $11.6 million in a private placement led by Opko and defendant Frost.  Opko described MabVax as "focused on discovering and developing innovative vaccine and monoclonal antibody-based therapeutics for the diagnosis and treatment of cancer."

17.     As of September 2018, both Cocrystal and MabVax were highlighted on Opko's website as among the Company's notable "strategic investments."  According to Opko, the Company's "growth strategy includes investing in early-stage companies" – such as MabVax and Cocrystal – "that we perceive to have valuable proprietary technology and significant potential to create value for OPKO as a shareholder."

18.     Behind the scenes, defendant Frost placed Opko's investments in BioZone and MabVax at the heart of the Pump and Dump Scheme.  Defendant Frost and his co-conspirators took control of MabVax and BioZone, actively concealed this control, drained the target companies of valuable assets to enrich themselves, and then secretly funded a promotional scheme to "pump" the price of the stocks so that members of the illegal syndicate could "dump" significant stock holdings. Defendant Frost actively took steps to conceal the true nature of the Pump and Dump Scheme, such as falsifying SEC reporting documents to conceal his control over MabVax, because he knew, or at the very least recklessly disregarded, that his activities were illegal and subjected defendant Frost and the Company he ran to significant undisclosed legal, regulatory and financial risks.

19.     In the case of BioZone, Frost teamed up with Honig and Michael Brauser ("Brauser"), two other members of the Pump and Dump Scheme.   The three men caused the company to issue shares to them and their associates through a series of so-called "private investments in public equities," or "PIPE" financings, drove the price of the stock higher by secretly paying for a misleading promotional campaign and by virtue of manipulative trading, and then unlawfully sold their BioZone shares into the inflated market for proceeds of approximately $9.26 million.

20.     Specifically, in December 2010, defendant Frost purchased a publicly traded shell company, together with Honig and Brauser.  These individuals disguised their role in the acquisition

by purchasing the shares through another entity.  Soon thereafter, the Pump and Dump Scheme installed defendant Frost as the sole disclosed director of the company.  They then approached BioZone's predecessor with an offer to take the company public through a reverse merger, which included a promise to invest $8 to $15 million in BioZone's patented technology.  Defendant Frost then sold unprofitable assets to the public company in exchange for 8.3 million shares and the obligation to register the shares, providing him with additional value.

21.     After closing the reverse merger, the surviving company became BioZone. Defendant Frost, together with his conspirators, controlled BioZone through their ownership of stock and control of management.  For example, BioZone used the business address of defendant Frost, Honig and Brauser as its own business address, and Honig and Brauser were required to sign off on any business decision.  Nevertheless, BioZone failed to disclose its control by Honig and Brauser, with the knowledge and consent of defendant Frost, in public filings.

22.     Defendant Frost failed to make the promised investments in BioZone, but rather limited investments to keep the company operating at a minimum level.  Without needed financing, BioZone was forced to abandon its research and development efforts entirely by mid-2012.  Rather than investing in research and development as promised, defendant Frost, Honig and Brauser and other members of the Pump and Dump Scheme used their capital to amass ever-cheaper BioZone shares.  By April 2013, members of the Pump and Dump Scheme, including defendant Frost, beneficially owned approximately two-thirds of BioZone's outstanding shares.

23.     The members of the Pump and Dump Scheme then orchestrated the deposit of four million BioZone shares owned by Honig in a separate account, which involved the improper removal of restrictive legends on the share certificates and a false certification by BioZone's CEO.  They then used these shares to compensate the author of a promotional article in September 2013 (as detailed

below) and engaged in manipulative stock trading to create the false impression of market interest in BioZone.  On September 23, 2013, the trading volume of BioZone shares soared to 302,000 from zero the previous day, as members of the Pump and Dump Scheme manipulated the price of BioZone stock in anticipation of the promotional article.

24.     The market reacted strongly to the BioZone promotion and manipulative trading activity: the trading volume of BioZone stock rose from approximately 1,100 shares on September 25, 2013 to over 4.5 million shares on September 27, 2013 and to more than 6 million shares on October 2, 2013.  The share price increased from an average of about $0.48 during August 2013 to an intraday price of $0.97 on October 17, 2013.  The Pump and Dump Scheme sold over 15.7 million shares of BioZone for $9.26 million in proceeds, including nearly 2 million shares sold by defendant Frost for over $1 million in proceeds.  These sales occurred at artificially inflated prices, and left retail investors holding virtually worthless shares.

25.     As with BioZone, members of the Pump and Dump Scheme assumed undisclosed control over MabVax through a reverse merger.  Following the reverse merger, in March and April 2015, Honig orchestrated two private placement financings for MabVax: Series D and Series E.  Defendant Frost participated in both the Series D and Series E financing on terms highly favorable to him through entities that he owned and controlled.

26.     After securing undisclosed control over MabVax, members of the Pump and Dump Scheme again orchestrated the issuance of false and misleading promotional articles (as detailed below) and engaged in manipulative trading in order to prime the market for insider sales. The promotion was successful.  Trading volume in MabVax shares rose almost 7,500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, following the announcement of the Series E private placement.  The volume again increased to 858,709 on April 9, 2015, the day after a

- 8 -

promotional article was published by defendant Frost's co-conspirators.  MabVax's share price went

from a closing price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015, a 125%

increase.  Between April and June 2015, the members of the Pump and Dump Scheme sold over 1.7

million shares of MabVax stock for over $5.62 million in proceeds.  Later, between July and

December 2015, members of the Pump and Dump Scheme engaged in a second round of false and

misleading promotional activity and insider sales, enabling them to sell over 1.4 million additional

shares of MabVax stock for over $2.75 million in proceeds.

27.     Defendant Frost's participation was critical to the MabVax pump and dump.  For

example, even though defendant Frost and his investment entity acquired MabVax shares with an

intention to control management, he filed a Schedule 13G on April 10, 2015 that falsely indicated he

was a passive investor.  He also failed to disclose that he was working in concert with other members

of the Pump and Dump Scheme to direct and control management of MabVax, rendering his

disclosure of a 6.86% ownership stake materially misleading.  Defendant Frost made similarly

improper filings on February 8, 2016, February 3, 2017 and January 18, 2018 – all of which

concealed his true interests in MabVax and participation in the Pump and Dump Scheme.

## DEFENDANTS' MATERIALLY FALSE AND
## MISLEADING STATEMENTS

**Materially False and Misleading Statements in Promotional Articles**

28.     Before and during the Class Period, members of the Pump and Dump Scheme,

including defendant Frost, paid to have false and misleading articles issued in investor publications

that promoted investments by Opko in order to artificially inflate the prices of the target companies'

securities.  The articles emphasized the purported investing acumen of defendant Frost and Opko in

order to generate investor enthusiasm for the target companies' securities and thereby drive up the

prices of those securities so that members of the Pump and Dump Scheme could sell their own

holdings at artificially inflated prices.  These articles were issued with the understanding that they would not disclose the compensation being paid to the articles' authors and would conceal the authors' connection to the Pump and Dump Scheme so as to create the false impression that the promotional articles were being authored by neutral third parties.

29.    Members of the Pump and Dump scheme, including defendant Frost, were the ultimate makers of the statements in the promotional articles.  They had ultimate authority over the articles' content and communication.  They paid for the articles, they reviewed the articles prior to publication, they decided what content to include in the final articles, and they determined whether and when to publish any particular article.

30.    On September 26, 2013, the article "Opko and Its Billionaire CEO Invested in Biozone" appeared on the investor news website *Seeking Alpha*.  As part of a scheme to inflate the price of BioZone securities, the article emphasized defendants Opko and Frost's ownership in BioZone in order to induce investor interest.  For example, among similar representations, the article stated that "Dr. Frost and his scientific team are capable of a much higher level of scientific analysis than I could ever conduct.  ***[Dr. Frost's] large position in BioZone is a strong validation of the company's technology***. . . .  But the additional future revenue streams from Opko, the drug reformulation segment, and BioZone's branded generic products make BioZone tremendously undervalued.  In my opinion, ***BioZone should be trading for more than twice today's valuation***."[1]  In addition, the article falsely stated that BioZone had a formulation ready for testing to be brought to the billion-dollar injectable drug market, even though, as defendant Frost knew, BioZone had ceased all efforts to develop this technology in mid-2012 due to a lack of promised financing.

---

[1]    Emphasis has been added herein unless otherwise noted.

31.     The article, by investor analyst John Ford ("Ford"), also failed to disclose that Ford had been directed by members of the Pump and Dump Scheme to write the article, was told what to include in the article, and was compensated as part of the Pump and Dump Scheme through the sale to Ford of below-market BioZone shares on September 23, 2013.  Instead, Ford falsely represented that the article "expresses my own opinions.  *I am not receiving compensation for it* (other than from *Seeking Alpha*).  I have no business relationship with any company whose stock is mentioned in this article."

32.     On November 13, 2013, Ford published another article regarding BioZone on *Seeking Alpha*, entitled "BioZone Update."  The article again highlighted defendants Frost and Opko's investments in BioZone.  Ford stated that defendants Frost and Opko had orchestrated a recent transaction with nutritional supplement company, MusclePharm Corp. ("MusclePharm"), in order to prepare BioZone "for some type of *significant valuation enhancement*."  Ford had previously published an article on *Seeking Alpha*, entitled "Opko's Billionaire CEO Invests In MusclePharm," in which he stated that investors should "take a look at one of Dr. Frost's newest investments, MusclePharm," which "could provide investors with at least a 3 times return."  Neither article disclosed Ford's participation in or compensation by the Pump and Dump Scheme.

33.     On April 8, 2015, the article "Opko Spots Another Overlooked Opportunity in MabVax Therapeutics" appeared on the investor news website *Seeking Alpha.* As part of a scheme to inflate the price of MabVax securities, the article emphasized defendants Opko and Frost's investments in MabVax in order to induce investor interest.  For example, among similar representations, the article stated in pertinent part:

> Opko Health has a history of discerning overlooked assets in which to make strategic investments prior to value creation.  Opko shareholders, in turn, get exposure to not only Opko's core assets, but also to a bevy of smaller, high growth healthcare and

biotech assets. Opko has proven quite adept at then being able to monetize these investments later in their growth cycle, translating to meaningful value creation for Opko shareholders. Its path from $2 per share when it first went public to its current $14.30 share price is filled with examples of such investments. In this article, I shall take a look at Opko's most recent strategic investment in MabVax Therapeutics, a cancer immunotherapy company. MabVax presents a compelling investment opportunity at its current market cap relative to its pipeline.

*       *       *

**It seems MabVax presents another strong case study of Opko and Dr. Frost identifying an overlooked investment opportunity**.

34.     In addition, the article quoted defendant Frost as stating:

"The target for MabVax's first novel human antibody addresses important medical problems in need of better therapeutic solutions. The early data for its HuMab 5B1 antibody are encouraging and MabVax has a pipeline of dozens of novel antibody leads on its discovery platform from which it may select promising candidates to develop through clinical trials."

35.     The article was written by John O'Rourke ("O'Rourke"), defendant Frost's business partner and a key member of the Pump and Dump Scheme. Rather than disclose his identity and interest in MabVax and the Pump and Dump Scheme, O'Rourke used the alias "Wall Street Advisors," and falsely stated in the article that "[t]he **author has no business relationship** with" MabVax and was "**not receiving compensation** for [writing the article]."

36.     On July 1, 2015, the article "MabVax: Near-Term Catalysts Could Push Shares from $2 to over $5" appeared on the investor news website *Seeking Alpha*. As part of a scheme to inflate the price of MabVax securities, the article emphasized defendants Opko and Frost's investment in MabVax in order to induce investor interest. For example, among similar representations, the article stated that "Dr. Phillip Frost and Opko just invested in MabVax and given Dr. Frost's track record, MabVax could be another home run trade." The article continued in pertinent part:

**Dr. Phillip Frost and Opko investments validate MabVax's technology**

- 12 -

One of the primary reasons I've invested in MabVax is based on Dr. Phillip Frost's and Opko's, recent investment in the company.  Dr. Frost and Opko were the lead investor's in an $11.7 million deal.  *Undoubtedly Dr. Frost and his team of scientists conducted a high level of due diligence, which validates MabVax's technology*.

One of the most important questions for investors is whether or not MabVax's technology works.  Given the size of Dr. Frost's and Opko investments, in my opinion that question has been answered in the affirmative.  *In other words, Dr. Frost and Opko would not have invested in MabVax unless they believed the science was solid*.

I first became aware of Dr. Frost when I wrote about his flagship company Opko.  At the time of my first Opko article, the shares were trading at $4, and have since risen above $19.  Opko is a great company, and its involvement with MabVax will be positive for MabVax.

*Another example of Dr. Frost's success includes his investment in Cocrystal Pharma at $.30 per share.  Cocrystal has traded above $1.50 this year, providing more than a 5X return.  I have done well investing in companies backed by Dr. Frost and MabVax could be one of his best performer*s.

37.     The article, again by investor analyst Ford, failed to disclose that Ford had been compensated by Honig for writing the article as part of the Pump and Dump Scheme.

**Materially False and Misleading Statements in**
**SEC Filings and at Investor Conferences**

38.     On November 12, 2013, the Company filed a Form 10-Q for the quarter ended September 30, 2013 (the "3Q 2013 10-Q").  The 3Q 2013 10-Q highlighted the importance of defendant Frost to Opko's business but failed to disclose his participation in the Pump and Dump Scheme, stating: "The loss of Phillip Frost, M.D., our Chairman and Chief Executive Officer, could have a material adverse effect on our business and product development."  The 3Q 2013 10-Q also discussed the Company's investment in BioZone, but made no mention of the investment's role in the Pump and Dump Scheme, stating, *inter alia*:

In February 2012, we purchased from BZNE $1.7 million of 10% secured convertible promissory notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal to $0.20 per common share, which BZNE Notes are due and

- 13 -

payable on February 24, 2014 and ten year warrants to purchase 8.5 million shares of BZNE common stock at an exercise price of $0.40 per share.

39.     In addition, the 3Q 2013 10-Q contained signed certifications by defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.

40.     On March 3, 2014, the Company filed a Form 10-K for the year ended December 31, 2013 (the "2013 10-K"). The 2013 10-K highlighted the importance of defendant Frost to Opko's business, stating: "The loss of Phillip Frost, M.D., our Chairman and Chief Executive Officer, could have a material adverse effect on our business and product development." The 2013 10-K similarly stated: "*Our success is dependent to a significant degree upon the involvement and efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D.*" The 2013 10-K continued in pertinent part, highlighting in particular the reputation of defendant Frost as material to the Company's business and continued financial success:

> *Our success is dependent to a significant degree upon the efforts of our Chairman and Chief Executive Officer, Phillip Frost, M.D., who is essential to our business*. The departure of our CEO for whatever reason or the inability of our CEO to continue to serve in his present capacity could have a material adverse effect upon our business, financial condition, and results of operations. *Our CEO has a highly regarded reputation in the pharmaceutical and medical industry and attracts business opportunities and assists both in negotiations with acquisition targets, investment targets, and potential joint venture partners*. Our CEO has also provided financing to the Company, both in terms of a credit agreement and equity investments. If we lost his services, our relationships with acquisition and investment targets, joint ventures, and investors may suffer and could cause a material adverse impact on our operations, financial condition, and the value of our Common Stock.

41.     The 2013 10-K also stated that Opko believed it was "substantially *compliant with all existing statutes and regulations* applicable to our business." While the 2013 10-K failed to disclose the Pump and Dump Scheme, it acknowledged the material importance that such illegal activity and the attendant risk of legal action could have on Opko's business, stating that "[l]egal actions could result in substantial monetary damages as well as *damage to the Company's*

*reputation* with customers, which could **have a material adverse effect upon our results of operations and financial position**."

42.     In addition, the 2013 10-K discussed the Company's investment in BioZone but made no mention of the investment's role in the Pump and Dump Scheme, stating, *inter alia*:

>     •     In February 2012, we purchased from Biozone Pharmaceuticals, Inc., a publicly-traded company engaged in the manufacture and sale of pharmaceutical and cosmetic products ("BZNE"), $1.7 million of 10% secured convertible promissory notes (the "BZNE Notes"), convertible into BZNE common stock at a price equal to $0.20 per common share, which BZNE Notes are due and payable on February 24, 2014 and ten year warrants (the "Warrants") to purchase 8.5 million shares of BZNE common stock at an exercise price of $0.40 per share.  On January 3, 2014, BZNE finalized its planned merger with Cocrystal Discovery, Inc. ("Cocrystal"), a privately-held biopharmaceutical company in which we made an investment in September 2009 (refer below and to Note 12 for details regarding our investment in Cocrystal).  In January 2014, we invested an additional $.5 million in the combined Biozone-Cocrystal entity pursuant to which we acquired 1 million shares of Biozone's common stock and 1 million warrants to acquire additional Biozone common stock.  As of December 31, 2013, we owned an approximately 16% equity position in BZNE.

43.     The 2013 10-K was signed by and contained signed certifications of defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.

44.     On May 9, 2014, the Company filed a Form 10-Q for the quarter ended March 31, 2014; on August 11, 2014, the Company filed a Form 10-Q for the quarter ended June 30, 2014; and on November 7, 2014, the Company filed a Form 10-Q for the quarter ended September 30, 2014 (the "2014 10-Qs").  The 2014 10-Qs contained misstatements similar to those described in ¶¶38-39 from the 3Q 2013 10-Q highlighting the importance of defendant Frost to Opko's business, discussing Opko's investment in BioZone, and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.

45.     On December 10, 2014, defendant Frost participated in the Oppenheimer Healthcare Conference.  During the conference, defendant Frost highlighted the Company's investment in

Cocrystal, calling it a potential "***home run***," without disclosing the investment's role in the Pump and Dump Scheme.  Defendant Frost stated in pertinent part:

> And so far as the companies in which we invest are concerned, Steve mentioned Cocrystal.
>
> I'll just point out by emphasizing a little bit more that the team that is in the new company as a result of the merger announced a week or so ago, we have Ray Schinazi who has been developing antiviral drugs for decades.  And he was the leading scientist developing the compounds that were the assets of Pharmasset that sold for over $11 billion.  And he had developed two other companies that were sold for over $3 billion, for one to Merck, and then over $1 billion for another one.  So he has a keen sense of going for the jugular in terms of developing new antivirals.
>
> Roger Kornberg, on the other hand, has a whole new concept of developing antivirals that will be brought to bear, as well. And our goal, in his part of the effort, is to develop the first pan-antiviral drug that would kill all viruses. It is a very ambitious goal. But we have a theoretical approach to it that is practical, and we are definitely working on that at the same time.
>
> ***So the point of all this is that Cocrystal is an example of the type of investment that we are making, where there is a possibility of a home run with a very small investment***.

46.     On February 27, 2015, the Company filed a Form 10-K for the year ended December 31, 2014 (the "2014 10-K").  The 2014 10-K contained misstatements similar to those described in ¶¶40-41 and 43 from the 2013 10-K highlighting the importance of defendant Frost and his reputation to Opko's business and stating that the Company was substantially compliant with all applicable laws and regulations, and contained signed certifications by defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  In addition, the 2014 10-K discussed the Company's investment in BioZone but made no mention of the investment's role in the Pump and Dump Scheme, stating *inter alia*:

> In 2012, we made a $1.7 million investment in Biozone. Effective January 2, 2014, Biozone completed a merger with Cocrystal, another entity in which we have an equity investment, to which Cocrystal was the surviving entity, and the name of the issuer was changed to Cocrystal Pharma, Inc. ("CPI").  Dr. Frost previously invested in both Biozone and Cocrystal.  Effective January 16, 2014, we invested an

additional $0.5 million in the company as part of a $2.75 million private placement and received 1.0 million shares of common stock and 1.0 million 10-year warrants exercisable at $0.50 per share.  At December 31, 2014, we hold an 8% ownership interest in CPI.

47.     On May 11, 2015, the Company filed a Form 10-Q for the quarter ended March 31, 2015 (the "1Q 2015 10-Q").  The 1Q 2015 10-Q contained misstatements similar to those described in ¶44 from the 2014 10-Qs highlighting the importance of defendant Frost to Opko's business and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  The 1Q 2015 10-Q also contained similar misrepresentations regarding the Company's investment in BioZone as stated in ¶46 from the 2014 10-K, but made no mention of the investment's role in the Pump and Dump Scheme.

48.     On August 5, 2015, the Company filed a Form 10-Q for the quarter ended June 30, 2015 (the "2Q 2015 10-Q").  The 2Q 2015 10-Q contained misstatements similar to those described in ¶47 from the 1Q 2015 10-Q highlighting the importance of defendant Frost to Opko's business and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  The 2Q 2015 10-Q also contained similar misrepresentations regarding the Company's investment in BioZone as stated in ¶46 from the 2014 10-K.   In addition, the 2Q 2015 10-Q discussed the Company's investment in MabVax, but made no mention of the investment's role in the Pump and Dump Scheme, stating, *inter alia*:

> In April 2015, we made a $2.5 million investment in a private placement transaction with MabVax Therapeutics Holdings, Inc. pursuant to which we acquired 33,333 shares of MabVax Series E Convertible Preferred Stock and warrants to purchase 1,666,667 shares of MabVax common stock.  Prior to our investment in MabVax, Dr. Frost held shares in MabVax indirectly through an entity in which he has an ownership interest. Dr. Frost, as well as non-affiliated investors, invested in the private placement transaction on the same financial terms.  In connection with the OPKO investment, Steven Rubin, our Executive Vice President, Administration, was appointed as an advisor to MabVax, and we have the right to designate two board members.

49.     On November 9, 2015, the Company filed a Form 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q").  The 3Q 2015 10-Q contained misstatements similar to those described in ¶48 from the 2Q 2015 10-Q highlighting the importance of defendant Frost to Opko's business, discussing Opko's investment in BioZone and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  In addition, the 3Q 2015 10-Q stated: "In October 2015, we made an additional $375 thousand investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock."

50.     On February 29, 2016, the Company filed a Form 10-K for the year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K contained misstatements similar to those described in ¶46 from the 2014 10-K highlighting the importance of defendant Frost and his reputation to Opko's business and stating that the Company was substantially compliant with all applicable laws and regulations, and contained signed certifications by defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  In addition, the 2015 10-K contained similar misrepresentation regarding the Company's investments in BioZone and MabVax as stated in ¶49 from in the 3Q 2015 10-Q, but made no mention of the investments' role in the Pump and Dump Scheme.

51.     On May 9, 2016, the Company filed a Form 10-Q for the quarter ended March 31, 2016; on August 8, 2016, the Company filed a Form 10-Q for the quarter ended June 30, 2016; and on  November 7, 2016, the Company filed a Form 10-Q for the quarter ended September 30, 2016 (the "3Q 2016 10-Q," and collectively the "2016 10-Qs").  The 2016 10-Qs contained misstatements similar to those described in ¶49 from the 3Q 2015 10-Q highlighting the importance of defendant Frost to Opko's business and attesting to the accuracy of Opko's financial reporting and the

disclosure of fraud.  In addition, the 2016 10-Qs discussed the Company's investments in BioZone and MabVax, but made no mention of the investments' role in the Pump and Dump Scheme, stating, *inter alia*: "We hold investments in . . . MabVax (1%) [and] COCP (8%) . . . .  In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock."  The 3Q 2016 10-Q provided additional discussion of Opko's investments, stating, *inter alia*:

> We hold investments in . . . MabVax (4%) [and] COCP (8%) . . . .  In October 2015, we made an additional $0.4 million investment in MabVax pursuant to which we acquired 340,909 shares of common stock at $1.10 and 170,454 warrants to purchase shares of common stock. . . .  In August 2016 we invested an additional $1.0 million in MabVax for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock.  In September 2016 we invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

52.     On March 1, 2017, the Company filed a Form 10-K for the year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K contained misstatements similar to those described in ¶50 from the 2015 10-K highlighting the importance of defendant Frost and his reputation to Opko's business and containing signed certifications by defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  In addition, the 2016 10-K contained similar misrepresentation regarding the Company's investments in BioZone and MabVax as stated in ¶51 from the 3Q 2016 10-Q, but made no mention of the investments' role in the Pump and Dump Scheme.

53.     On May 10, 2017, the Company filed a Form 10-Q for the quarter ended March 31, 2017; on August 8, 2017, the Company filed a Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q"); and on November 8, 2017, the Company filed a Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q," and collectively the "2017 10-Qs").  The 2017 10-Qs contained misstatements similar to those described in ¶51 from the 2016 10-Qs highlighting the

importance of defendant Frost to Opko's business and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud. In addition, the 2017 10-Qs contained similar misrepresentation regarding the Company's investments in BioZone and MabVax as stated in ¶51 from the 3Q 2016 10-Q, but made no mention of the investments' role in the Pump and Dump Scheme. Additional statements regarding the Company's investments in BioZone and MabVax were made in the 2Q 2017 10-Q and 3Q 2017 10-Q, including, *inter alia*:

> We hold investments in . . . MabVax (4%) [and] COCP (9%) . . . .
>
> *       *       *
>
> In July 2017, we invested an additional $0.1 million in MabVax for 152,143 shares of common stock,[2] and in May 2017 we invested an additional $0.5 million in MabVax for 285,714 shares of Series G Preferred Stock and 322,820 shares of Series I Preferred Stock. We had also invested an additional $1.0 million in MabVax in August 2016 for 207,900 shares of its common stock and warrants to purchase 415,800 shares of its common stock.
>
> In April 2017, we invested an additional $1.0 million in COCP for 4,166,667 shares of its common stock, and in August 2016, we had invested an additional $2.0 million in COCP for 4,878,050 shares of its common stock.

54.     On March 1, 2018, the Company filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K contained misstatements similar to those described in ¶52 from the 2016 10-K highlighting the importance of defendant Frost and his reputation to Opko's business and contained signed certifications by defendant Frost attesting to the accuracy of Opko's financial reporting and the disclosure of fraud. In addition, the 2017 10-K contained similar misrepresentation regarding the Company's investments in BioZone and MabVax as stated in ¶53 from the 3Q 2017 10-Q, but made no mention of the investments' role in the Pump and Dump Scheme.

---

[2]   The 2Q 2017 10-Q did not include the statement regarding Opko's July 2017 investment in MabVax.

55.    On May 8, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 (the "1Q 2018 10-Q"), and on August 7, 2018, the Company filed a Form 10-Q for the quarter ended June 30, 2018 (the "2Q 2018 10-Q").  The 1Q 2018 10-Q and 2Q 2018 10-Q contained misstatements similar to those in ¶53 in the 2017 10-Qs highlighting the importance of defendant Frost to Opko's business and attesting to the accuracy of Opko's financial reporting and the disclosure of fraud.  The 1Q 2018 10-Q and 2Q 2018 10-Q also discussed the Company's investment in BioZone and MabVax, but made no mention of the investments' role in the Pump and Dump Scheme, stating, *inter alia*:

> We hold investments in . . . MabVax (2%) [and] COCP (9%) . . . .
>
> In February 2018, we invested an additional $1.0 million in COCP for a convertible note, which is convertible into 123,456 shares of its common stock.  In April 2017, we invested an additional $1.0 million in COCP for 138,889 shares of its common stock, and in August 2016, we had invested an additional $2.0 million in COCP for 162,602 shares of its common stock.
>
> *      *      *
>
> In July 2017, we invested an additional $0.1 million in MabVax for 50,714 shares of common stock and in May 2017, we invested an additional $0.5 million in MabVax for 1,667 shares of Series L Preferred Stock and 107,607 shares of Series I Preferred Stock.

56.    The statements referenced in ¶¶38-55 above were materially false and misleading when made because they failed to disclose adverse facts pertaining to the Company's business, operations and financial condition, which were known to defendants or recklessly disregarded by them, as follows:

(a)    that defendant Frost had participated as a central member in the illegal Pump and Dump Scheme;

- 21 -

(b)     that the investments by defendants Frost and Opko in BioZone and MabVax were done in furtherance of the Pump and Dump Scheme in order to enrich defendant Frost and his associates and were not made in order to benefit Opko or the Company's shareholders;

(c)     that Opko's investments in BioZone and MabVax were worth considerably less than represented because of defendants' involvement in the Pump and Dump Scheme and, in the case of BioZone, because the target company had not been provided promised financing resulting in the cessation of research and development activities in mid-2012;

(d)     that defendant Frost had taken efforts to conceal his control over target companies in the Pump and Dump Scheme, including by falsely stating that he was acting as a passive investor in SEC filings and by concealing his concerted efforts to facilitate illegal stock manipulation with other members of the Pump and Dump Scheme;

(e)     that defendant Frost had facilitated the publication of false and misleading promotional materials in order to artificially inflate the stock of target companies in the Pump and Dump Scheme; and

(f)     that, as a result of (a)-(e) above, Opko was subject to significant and undisclosed legal, regulatory, reputational and financial risks should defendant Frost's involvement in the Pump and Dump Scheme come to light.

57.     Furthermore, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."  The failure of the Company to disclose the participation by defendants Frost and Opko in the illegal Pump and Dump Scheme in its periodic financial reports filed on Form 10-K and Form 10-Q during the Class Period violated 17 C.F.R. §229.303(a)(3)(ii),

because these undisclosed facts were known to defendants and were reasonably expected to have an unfavorable impact on the Company's sales, revenues and income from continuing operations.

58.    On September 7, 2018, the SEC issued a press release, entitled "SEC Charges Microcap Fraudsters for Roles in Lucrative Market Manipulation Schemes," which named defendants Frost and Opko as key figures in the illegal Pump and Dump Scheme.  The SEC filed its complaint against defendants Frost and Opko and others in the U.S. District Court for the Southern District of New York (the "SEC Complaint").  The press release describing the SEC Complaint stated in relevant part:

> The Securities and Exchange Commission today charged a group of 10 individuals and 10 associated entities for their participation in long-running fraudulent schemes that generated over $27 million from unlawful stock sales and caused significant harm to retail investors who were left holding virtually worthless stock.
>
> According to the SEC's complaint, from 2013 to 2018, a group of prolific South Florida-based microcap fraudsters led by Barry Honig manipulated the share price of the stock of three companies in classic pump-and-dump schemes. ***Miami biotech billionaire Phillip Frost allegedly participated in two of these three schemes***.  Honig allegedly orchestrated the acquisition of large quantities of the issuer's stock at steep discounts, and after securing a substantial ownership interest in the companies, ***Honig and his associates engaged in illegal promotional activity and manipulative trading to artificially boost each issuer's stock price and to give the stock the appearance of active trading volume.  According to the SEC's complaint, Honig and his associates then dumped their shares into the inflated market, reaping millions of dollars at the expense of unsuspecting investors***.
>
> "As alleged, Honig and his associates engaged in brazen market manipulation that advanced their financial interests while fleecing innocent investors and undermining the integrity of our securities markets," said Sanjay Wadhwa, Senior Associate Director in the SEC's Division of Enforcement.  "They failed to appreciate, however, the SEC's resolve to relentlessly pursue and punish participants in microcap fraud schemes."
>
> The SEC's complaint, which was filed in federal district court in Manhattan, charges Honig, John Stetson, Michael Brauser, John R. O'Rourke III, Mark Groussman, ***Frost***, Elliot Maza, Robert Ladd, Brian Keller, John H. Ford, Alpha Capital Anstalt, ATG Capital LLC, GRQ Consultants Inc., HS Contrarian Investments LLC, Grander Holdings Inc., Melechdavid Inc., ***OPKO Health Inc.***, Frost Gamma Investments Trust, Southern Biotech Inc., and Stetson Capital

Investments Inc. with violating antifraud, beneficial ownership disclosure, and registration provisions of the federal securities laws and seeks monetary and equitable relief.

59.     The SEC Complaint detailed how, since at least 2010, defendants Frost and Opko had played active and central roles in the Pump and Dump Scheme and how the scheme centered on investments in companies that were later revealed to be BioZone and MabVax.  Among its many detailed allegations, the SEC Complaint charged the following:

> 1.     This case involves three highly profitable "pump-and-dump" schemes perpetrated by Honig, Stetson, Brauser, O'Rourke, Groussman, and *Frost*, and their entities GRQ, SCI, Grander, HSCI, Melechdavid, ATG, *Opko*, FGIT, and Southern Biotech from 2013 through 2018 in the stock of three public companies ([*BioZone*], Company B, and [*MabVax*]) . . . .

> *                *                *

> 7.     *All told, the three schemes brought Defendants millions of dollars: [BioZone's] pump and dump generated for the Defendants more than $9.25 million in stock sales proceeds*, and Company B's pump and dump generated more than $9.5 million. *And their most recent venture, the pump and dump scheme with respect to [MabVax], brought in over $8.3 million in stock sales proceeds.  In the wake of these schemes, public investors were left holding virtually worthless stock.*

60.     On news that the primary securities market regulator for Opko had charged both the Company and its celebrated CEO and Chairman with serious violations of the federal securities laws, the price of Opko stock fell sharply.  On September 7, 2018, the price fell to $4.58 per share before trading was halted by the SEC, an 18% decline from the prior day's close.  When trading resumed on September 14, 2018, the stock fell an additional 15% to close at $3.90 per share.  Total trading volume during these two days was an extremely high 46 million shares traded.

### LOSS CAUSATION AND ECONOMIC LOSS

61.     As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Opko common stock and operated as a fraud or deceit on purchasers of Opko common stock.  As detailed above, when the truth about Opko's

misconduct was revealed on the filing of the SEC Complaint by the Company's primary market regulator, which alleged that defendants Opko and Frost had committed securities fraud and contained significant and detailed charges of wrongdoing, the value of the Company's stock declined precipitously as the prior artificial inflation no longer propped up the stock's prices. The decline in the price of Opko stock was the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price decline negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Opko stock and the subsequent significant decline in the value of the Company's stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

62. At all relevant times, defendants' materially false and misleading statements and omissions alleged herein directly or proximately caused the damages suffered by plaintiff. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Opko's business, operations and financial condition, as alleged herein. Before the time of plaintiff's purchases of Opko common stock, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the price of Opko stock to be artificially inflated. Plaintiff and other members of the Class (as defined below) purchased Opko stock at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

63.     At all relevant times, the market for Opko common stock was an efficient market for
the following reasons, among others:

(a)     Opko stock met the requirements for listing and was listed and actively traded
on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's 2017 10-K, Opko had more than 559 million
shares outstanding as of February 20, 2018, demonstrating a very active and broad market for Opko
common stock;

(c)     as a regulated issuer, Opko filed periodic public reports with the SEC;

(d)     Opko regularly communicated with public investors via established market
communication mechanisms, including the regular dissemination of press releases on national
circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(e)     unexpected material news about Opko was rapidly reflected in and
incorporated into the Company's stock price.

64.     As a result of the foregoing, the market for Opko common stock promptly digested
current information regarding Opko from publicly available sources and reflected such information
in Opko's share price.  Under these circumstances, a presumption of reliance applies to plaintiff's
purchases of Opko common stock.

65.     A presumption of reliance is also appropriate in this action under the Supreme Court's
holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims
are based, in significant part, on defendants' material omissions.  Because this action involves
defendants' failure to disclose material adverse information regarding Opko's business and
operations, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that

the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

66.     Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather statements of historical and present fact, and thus did not fall within any "Safe Harbor."

67.     Defendants' verbal "Safe Harbor" warnings accompanying their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

68.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Opko who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Opko common stock during the Class Period and who were damaged thereby (the "Class").  Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all

relevant times, members of their immediate families, and defendants' legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

70.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Opko stock was actively traded on the NASDAQ. There are likely thousands of members in the proposed Class, if not more.  Record owners and other members of the Class may be identified from records maintained by Opko or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

71.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

72.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

73.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

        (b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Opko;

        (c)     whether the price of Opko common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

74.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

75.      Plaintiff incorporates the foregoing paragraphs by reference.

76.      Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

77.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes and artifices to defraud;

(b)      Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and other members of the Class in connection with their purchases of Opko common stock.

- 29 -

78.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Opko common stock.  Plaintiff would not have purchased Opko stock at the prices paid, or at all, if plaintiff had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

79.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of Opko common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Defendant Frost

80.     Plaintiff incorporates the foregoing paragraphs by reference.

81.     Defendant Frost acted as a controlling person of Opko within the meaning of §20(a) of the 1934 Act.  By virtue of his high-level positions, stock ownership and power to control public statements about Opko, defendant Frost had the power and ability to control the actions of Opko and its employees.  Defendant Frost participated in and had awareness of the Company's operations and intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public.  Defendant Frost had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.  Defendant Frost provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     By reason of such conduct, defendant Frost is liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Declaring that defendants violated the 1934 Act and awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.      Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.      Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  October 8, 2018                ROBBINS GELLER RUDMAN
                                                    & DOWD LLP
                                        JACK REISE
                                        Florida Bar No. 058149


                                                    *s/Jack Reise*
                                        _____
                                        JACK REISE

                                        120 East Palmetto Park Road, Suite 500
                                        Boca Raton, FL  33432
                                        Telephone:  561/750-3000
                                        561/750-3364 (fax)
                                        jreise@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

LEEDS BROWN LAW, P.C.
JEFFREY K. BROWN
One Old Country Road, Suite 347
Carle Place, NY  11514
Telephone:  516/873-9550
516/747-5024 (fax)

Attorneys for Plaintiff